Our next case this morning is number 18-1957, Creative Spark v. Kingsford Products. Good morning, Your Honors, and may it please the Court. The inventors of the 803 patent achieved something that had never been done before in a way that had never been demonstrated to work before. The charcoal briquettes claimed in the 803 patent get hotter faster and stay hotter longer than previous briquettes. They can get to 1,000 degrees Fahrenheit within 15 minutes after ignition and sustain that temperature for 15 minutes thereafter, and they do so using grooves, which had never been known to provide that combination of benefits before, getting hotter faster and staying hotter longer, providing both superior ignition and superior burning. The Board's decision that the time and temperature limitations of the claims of the 803 patent are obvious over Burke, Wolfe, and Peters is not based on evidence, but on silence and on speculation. The speculation that a person of ordinary skill in the art can cherry-pick claimed times without claimed temperatures from one grooveless briquette, Burke, and claimed temperatures without the claimed time from another grooveless briquette, the conventional briquettes described in the 803 patent, mash those together with grooves and achieve the never-before-achieved time and temperature limitation. That despite Burke and Peters both stating that prior attempts at grooves like Wolfe's did not provide both desired optimal ignition and burning characteristics, as even the Board recognized. That despite the Board finding nothing in Burke disclosing any temperature that would claimed in the 803 patent after any length of time, and that despite no evidence that came for its chimera of a briquette, its Frankenstein's monster of Burke, Peters, and Wolfe was guaranteed to reach 1,000 degrees Fahrenheit at all, much less within 15 minutes after ignition, and much less sustained that temperature for 15 minutes thereafter. This is not a case where two competing conclusions can fairly and reasonably be drawn from the same evidence. This is a case where the Board's purported evidence that Burke, Wolfe, and Peters hits the time and temperature limitations is silence. And silence is not substantial evidence, and it especially is not substantial evidence against our uncontested evidence that the combination of Burke, Wolfe, and Peters would not necessarily achieve the time and temperature limitations. Now, I emphasize necessarily... Can I just summarize what at least I'm remembering to be the gist of the Board's decision? That the temperature limitation is taught in the 803 patent itself by saying these are conventional briquettes, and there was, I think, some expert testimony to bolster what the language of conventional briquettes and what they will sustainably burn at, and that this key paragraph in one of the pieces of prior art that uses the word optimal should be read with not a kind of diminished volume on the word optimal as you summarize it, but with a volume increase on the word optimal as you say it, namely that all that said was there are a variety of ways that have been tried to make this better, and those ways haven't been optimal, and therefore that's not either a teaching away or really much of a negative evidence that the Board had to accept to say that the otherwise supportive combination would have been... There would have been a motivation to do that. So the Board actually couched its description of Burke and Peters a little bit more strongly than that, and particularly with respect to their characterizations of previous efforts at grooves. It's not just do not provide desired optimal ignition and burning characteristics. The Board even said, and you can find this at, I believe it's appendix 19 and 20, as well as 24 and 25, that Burke and Peters described the unsatisfactory results achieved to date in the prior art, which at that time would have included Wolfe, which predates both references by two, predates Peters by two decades and Burke by three. And again, at appendix 24 and 25, the Board characterizes those references as stating, again, they are merely purportedly, reporting the disappointing nature of results achieved to date using surface discontinuities such as grooves. Now, this Court's predecessor has recognized that descriptions of unsatisfactory and disappointing results using a prior art technique is not only enough to establish teaching away, but is the very antithesis of obviousness. And that comes out of the In re Rosenberger case that we described in which the primary reference on which the rejection relied stated this pill packing technique, sorry, this pill preform technique and this dusting technique, which is loosely similar to what's going on in the claims, yields these unsatisfactory results. The dishware produces, breaks, it doesn't pass the acid boil test, and it just provides these disappointing results. And at the very least, even if the Board's read of Burke and Peters to be limited to expressing disappointment and unsatisfaction with prior art efforts at grooves is upheld, and we would agree that is reviewed for substantial evidence, its legal conclusion that those do not establish teaching away is inconsistent with this Court's precedence and therefore constitutes legal error. Do I understand right that there was no, there was nominally no unexpected results assertion as part of the, I guess, your defense against the challenge? Your Honor, I don't think we couched it as unexpected results. What we argued principally was that there wasn't evidence that the combination of Burke, Wolf, and Peters would have even achieved the temperature in the conventional briquettes. Now, we did provide evidence of skepticism of the, that grooves could provide both improved ignition and improved burning with reference to our citations in Burke and Peters, and that, again, is with respect to that language, do not provide desired optimal ignition and burning. So, your Honor, returning to the time and temperature limitations, one of two things has to be true. Kingsford either presented a legally deficient theory or prevented a factually unviable theory. The legally deficient theory is that a reasonable expectation of success, which is the theory Kingsford presented in its petition and what the Board made its final written decision based on, is that a reasonable expectation of success can be used to substitute for a limitation not proven to be present in Burke, Peters, and Wolf. This Court's precedents don't allow that. Before, as a threshold issue, arriving at the reasonable expectation of success inquiry, first, all the limitations must be demonstrated to be present in the prior art, and that hasn't happened here. The best way we can understand Kingsford's theory, assuming that it did not present this legally deficient theory, is that it's actually relying on a theory of inherency, that it is using the description of the 1,000 degree Fahrenheit after 25 minutes conventional briquettes in the 803 patents as a way to interpret Burke. Doesn't the 803 patent teach that a ready-to-cook temperature at 1,000 degrees Fahrenheit was conventional? Yes, after 25 minutes. I think following up on that, what we don't know from the Board is that, or what we don't have evidence to support the Board's conclusion, that the comparison of the ready-to-cook temperature in the 803 patent is the same as the ready-to-cook temperature purportedly described in Burke that's allegedly reached after 15 minutes. In other words, we don't know that Burke's expressly disclosed 380 degrees Fahrenheit within 15 minutes, which admittedly was by different measurement techniques, equates to what the 803 patent would characterize as a 1,000 degree Fahrenheit cooking temperature. It's an apples-to-oranges comparison. The Board simply sort of made a leap of logic in its final written decision in simply saying, in the absence of any disclosure in Burke regarding the temperature that would have been measured inside the pile of burning briquettes, a person of ordinary skill in the art would have expected the briquettes to have reached a temperature of 1,000 degrees Fahrenheit when they were ready to cook. And again, we don't know why the Board thought that. We don't know what evidence, if any, would have supported that conclusion. It doesn't appear that there is any. And again, this is against uncontested evidence that charcoal may burn, does not always necessarily burn at 1,000 degrees Fahrenheit. Yes, there is testimony from Dr. Smith, Kingsford's expert, saying, yes, it starts at 600 degrees, it'll get to 1,000 degrees Fahrenheit. But if you continue through his deposition, he states, it's not always exactly 600, it's not always exactly 1,000. Those are ranges, and those are typical. Typical is not enough to sustain an inherency argument. It requires necessarily a scientific certainty that the Burke-Wolfe-Peters combination would have achieved 1,000 degrees Fahrenheit after any amount of time, much less within 15 degrees after ignition, and much less to have sustained that for 15 minutes thereafter. Why is that necessary if the 803 patent teaches 1,000 degree temperature to be conventional? So, it's not a universal fact that all charcoal, previous charcoal, burns at 1,000 degrees Fahrenheit. While true that the 803 patent does characterize 1,000 degrees Fahrenheit as a conventional temperature that briquettes can reach after 25 minutes, the knowledge of a person of ordinary skill in the art also included examples of charcoal burning at temperatures lower than that. And one key example of that that was not addressed by the board is the Hamer reference. This is at Appendix 4662. It's explained by our expert at Appendix 4741 and 4742, in which a charred brown coal, charred lignite, is burning in a bed reactor at temperatures ranging from 752 degrees Fahrenheit to 932 degrees Fahrenheit. Yes, those aren't briquettes, but at the same time it illustrates the point that not all charcoal burns at 1,000 degrees Fahrenheit, despite the fact that the 803 patent indeed identified an example of charcoal in the prior art that burned at 1,000 degrees Fahrenheit after 25 minutes. Your Honors, I see I'm into my rebuttal time. I'm happy to answer any further questions. Otherwise, I'll pop back up here in a few minutes. Okay. Thank you, Mr. McNesh. Thank you, Your Honor. Mr. Ainsworth. May it please the Court. Charcoal briquettes are an old technology. And the Board correctly found that the combination of Peters, Burke, and Wolfe rendered obvious the claims on appeal here, as well as correctly found that Claims 109 were anticipated by Saunders II. Peters taught us that modifying the surface area and the weight, which is a combination of density and volume, modifying those factors, you can change ignition time and burn time of any briquette of any shape or size. That's what Burke taught. I'm sorry, that's what Peters taught. Burke taught us that it was desired to achieve an ignition temperature of at least 15 minutes and maintain a burn time for up to 45 minutes. The idea of having a shortened ignition time and a long burn time were well known in the art. The Board correctly found, based on the admission of the patent owner, that it was known conventional briquettes achieved cooking temperatures of 1,000 degrees. That's undisputed. In their opening brief, they really didn't address the fact that was admission of their inventors and their patent. What else does the patent tell us? Talk about why you think it is legally sufficient to give at least a petition to say what conventional briquettes would do, answering your friend's argument that when the obviousness case is asserted to be based on these three references, you need to find necessity of 1,000 percent or express teaching of 1,000 degrees in those three pieces of prior art. Your Honor, to that point, the evidence of record was those three references along with the admission from the patent owner. That was part of our petition. It was the patent owner's admission as to what a conventional briquette did, that conventional briquettes achieved temperatures of 1,000 degrees. On top of that, there was substantial testimony from Dr. Smith at pages— And just to be clear, I guess I'm looking at your petition appendix 161, 162. At least ground one is stated in the heading as 1 through 32 would have been obvious over Burke, Wolfe, and Peters. It doesn't include what the patent says, although you talk about it in the body of that. Does that make any difference? Your Honor, I don't think that makes any difference. I agree the three references that were our primary grounds were stated there, but then we've explained throughout the petition why a person who wants to fill in the art would understand that conventional briquettes achieve temperatures of 1,000 degrees when they are at their cooking temperature point. And I want to point out also that in column one of the 803 patent, the patent owner describes Burke as describing conventional materials and compositions. That's how the patent owner characterized Burke, in that column one, the final paragraph at line 54 to 60. So they themselves say, here's Burke. It's conventional materials, conventional compositions, and then they describe conventional briquettes generically as achieving cooking temperatures of 1,000 degrees. The deficiency that they try and argue is in their prior art is the fact that Burke, which provides temperatures of, describes cooking temperature of 380 degrees, is measuring it at a different point with respect to the briquettes. It's measuring with thermocouples above the burn vessel as opposed to the 803 patent where the testimony was they measured it by sticking a thermocouple into the pile of briquettes. Clearly, if you're measuring within a pile of briquettes, you're going to have a different temperature than when you're measuring above the burn vessel. The testimony from Dr. Smith at A676 to A678 describes why conventional briquettes would burn at temperatures above 1,000 degrees. While they point to examples of briquettes that ignite below 1,000 degrees, the testimony was they ignite around 600 or above, but to sustainably combust, to maintain a temperature without the help of, for example, an accelerant, they have to be above 1,000 degrees to maintain that exothermic reaction. That's a testimony of Dr. Smith. That testimony was undisputed in the record. Their expert did not contradict that testimony. In addition to Dr. Smith's testimony, there was a Burkhart reference that's at column 9, line 3542, again confirming it was known that conventional grill charcoal burns at temperatures of 1,000 to 1,200 degrees. Dr. Spape, their expert on cross-examination, also admitted and confirmed that, yes, the ALG patent says conventional briquettes burn at temperatures above 1,000 degrees. This court in Constance v. ADM said it's strong evidence of obviousness when the applicant admits what's in the prior art. Here we have that admission. Conventional briquettes achieve temperatures of 1,000 degrees when they're in the burn phase, and that is precisely what the board relied upon in saying the combination of Burke, Peters, and Wolfe in view of what was known about conventional briquettes would achieve temperatures of 1,000 degrees when combined. The appellant raises this argument about the teaching away. First of all, I want to point out there was no challenge to the evidence on the motivations to combine Burke, Peters, and Wolfe in terms of that there's expressed teachings and why you would combine those three references together. That was not challenged before the board. What they do raise is a teaching away argument. And their teaching away argument, that is a finding of fact that the board made that the prior art, in particular Burke and Peters, and those two sentences in the background section of those patents were not providing a teaching away. At most, they were describing disappointing results. And this court has said multiple times that describing a prior art technique as being inferior is not sufficient to confer non-obviousness upon an otherwise obvious combination. And that is all that Burke and Peters said was these don't achieve the desired optimal burning and ignition characteristics. They in fact admit, they state, things like grooves or flutes and channels can enhance combustion or ignition but don't achieve our desired optimal characteristics. And that makes sense when you read what Burke and Peters are trying to do. Both of them are trying to extend the burn time. They're trying to have burn time to 35 to 45 minutes. That was what their goal was, was short ignition times and long burn times. So they didn't view the surface discontinuities as necessarily providing their optimal benefits. But that wasn't a criticism that you cannot use a groove or a flute or what have you to enhance the ignition of the briquette. In terms of, and Petitioner's arguments on, I'm sorry, Pellin's arguments on skepticism and long felt need all pretty much recycle the same evidence from Burke and Peters. Namely that those two sentences describing what the prior art had done with grooves was insufficient or was expressing skepticism of using grooves for purposes of enhancing the ignition and combustion characteristics of briquettes. And as the board correctly found, that wasn't a skepticism that the invention would work. It was a skepticism that these weren't the best ways to necessarily enhance and achieve your desired optimal characteristics. Can you address one thing? And I'm not remembering it precisely. I think there was something in the record, at least in the briefs, to the effect that Kingsford, when it put onto the market its grooved briquettes, touted this as one of the largest improvements in the history of Kingsford briquettes. What role does that play in the obviousness analysis? Your Honor, we don't think those statements should play any role in the obviousness analysis. First of all, what role did they play, either in the arguments or in the board's decision? The board addressed the Clorox press release and said it represented at least a recognition of, because they already raised it in the context of a long-felt need, and said it may have represented, the board found it may have shown a general need for improved briquettes, but they didn't demonstrate a long-felt, unmet need for grooved briquettes. Now that press release by the... Well, at that level of generality, why is that clearly wrong? What not clearly wrong? When the company that is, I assume the leader, but anyway, a major maker of briquettes says, we just made a giant leap in what everybody knows you want, which is get the cooking started and make it last. Why is that not, at that level of generality, pretty powerful evidence of meeting a long-felt need? Well, Your Honor, because what that... First of all, there's no evidence that the charcoal briquettes described in the Clorox press release, the Kingsford press release, are embodiments of the claimed invention. So to suggest that what's described there is an embodiment of what they've claimed, we would disagree with it because that's not part of the record here. Second of all, what it expressed was... Did they assert that the subject of the press release were embodiments? There's no expert testimony or opinion in this proceeding, Your Honor, showing that the Kingsford briquettes are an embodiment of the invention. To be fair, they have sued us in district court. They would like to show we are embodiments of their invention. We dispute that. But that's not part of this record before the court on review. So our press release, I don't think, is evidence that a commercial embodiment has met a long-felt need. But even if it's not a long-felt need, it still falls in the category of industry praise, doesn't it? I would agree, Your Honor. You could argue that that is evidence of praise of Kingsford's product, which also that press release described a new formulation. It said we have a new formulation. We now have grooves also on a briquette. And by the way, the press release talks about achieving and maintaining a cooking temperature of 380 degrees Fahrenheit. So that's what that Clorox press release talked about, or the Kingsford press release was talking about their briquettes. I assume that's measured at the grill. Exactly, how Kingsford has always measured. Because both Burke and Peters are Kingsford patents. That's how we have... Where's the press release in the record? It is at appendix 3516. And it describes... It does describe having added grooves to the briquette. Kingsford had grooves on briquettes before this. What was the page number? Appendix 3516 and 3517. And grooves were not a simple thing. They're actually part of the name of your product, right? Yeah. Surefire grooves. That's true. That was part of the marketing was Surefire grooves. Kingsford had grooves on its briquettes prior to the Saunders application. That is also evidence in the record. That's the testimony of Mr. Swatling, the Kingsford employee, who was making briquettes in 1909 with grooves on them. But if you look at the press release, for example, over on page 3517 of the appendix, the second page of the press release, again, we're talking about achieving a temperature of 300 degrees Fahrenheit. There's no... Your Honor, we would agree this is praising our product, but the patent owner did not make the argument this was, in fact, praise for their invention, and we don't think there's a connection that's been made in this record to the claims of the 803 patent. For the reasons we've stated in our brief, unless there are further questions from the court... I have a question. So the board stated that the relevant skepticism is expressed at the time of the invention, and then it's cited to several of our cases. Was that a correct expression of the law? And if not, did that taint the rest of the inquiry? Your Honor, I don't believe that the... That is what the board said, that the correct time for skepticism or relevant skepticism is at the time of the invention. That is what the board said. And I think it depends. And I think what the board was saying was there has to be skepticism for the claimed invention in terms of... And here, the claimed invention isn't just putting grooves on briquettes, but putting grooves on briquettes to achieve these particular time and temperature limitations. And they're concerned with the Frank reference, which is what they were saying, why we don't think this is skepticism. It's a reference from 70 years ago, approximately. They didn't say don't use grooves. It was just saying that when you use brown coal and put grooves on brown coal briquettes, that they're subject to premature crumbling. And the board found that that wasn't sufficiently tied to what's claimed in the 803 patent, which is charcoal briquettes with grooves, that that would be sufficient evidence that a person skilled in the art wouldn't believe that you could achieve the improved burn or ignition and burn times with grooves. Where is the press release referenced in the board's decision? It's on appendix 12, Your Honor, page 12. In the Longfelt Needs section. Okay. Can you just remind me the priority date of this patent is what? Your Honor, it depends on the claims, because there's some claims that don't have different limitations. And this traces back through at least one CIP, right? That's correct, Your Honor. And our anticipation grounds was based on the fact there was a difference between the original application and the application of the 803 patent. So there are different claims at issue. And I guess I'm interested in the relation between the dates and the priority, even if there's more than one of them, and the prior art that's being asserted. So the original application, the first Saunders application, was filed in 2002. Our most recent prior reference, the Burke reference, was filed in 1996. So approximately six years between the two references. Unless there's further questions, I seem out of time. I thank the Court. Okay. Thank you, Mr. McNish. Mr. McNish, did you rely on the press release as industry praise or just long-felt need? So we relied on it as long-felt need principally. We also relied on it in a more general sense in the introduction of our patent owner response and in our brief on appeal. Did you rely on it for industry praise? No, Your Honor. Not expressly. But I do want to stick with the press release for a little bit because it is some very powerful evidence of non-obviousness under the rubric of the Heidelberger-Druckmaschinen case in which there was a competitor that had previously tried and failed to achieve something and then turned around and adopted it and then turned around again and said that was obvious. If you take a look at our opening brief, there's citations from some of the district court documents that were co-pending, a motion to stay in an interrogatory response, in which Kingsford stated, we know all of the prior art. And there are also documents that Kingsford says, we've been making charcoal since 1920 and we're the leader in the field. And all of that's probably true. Yet, you don't see this commercial launch of the surefire briquettes which Kingsford itself calls as the first significant advancement in charcoal until January 2006, which is after the latest priority date in June 2004 of the challenge claims and the claims on appeal here. So ultimately what you're seeing here is a very significant reversal in Kingsford's stance. And what prompted that reversal? In our view, the evidence shows it was when Kingsford learned about Saunders II, which the evidence established Kingsford had learned about Saunders II, which describes these groove briquettes, which published in November 2004. I want to get back to something my colleague said about motivation to combine and the concept that we did not contest the board's motivation to combine. We did. We contested whether the board was correct in asserting, for instance, that Burke and Peters teach that grooves can improve enhancement of ignition and or overall burning. And that was what the board actually relied on in its motivation to combine analysis. Now, that and in enhanced commencement of ignition and or overall burning isn't there. It's not in Peters. It's not in Burke. And I believe even Kingsford acknowledged it as a typo in its petitioner's reply. So ultimately, to the extent that the board's motivation to combine findings rests on the proposition that Peters and Burke teach that grooves can improve both ignition and burning, that contradicts the reference, and that's not supported by substantial evidence, because substantial evidence cannot be found by contradicting a reference. With the remainder of my time, I'd like to address the time and temperature limitations. And one question that remains unanswered to this date is, how do we know Burke wasn't designed to burn at lower temperatures in order to obtain its particular performance that it describes, again, achieving what it calls a time to heat, a time to 380 Fahrenheit, within about 15 minutes, and sustaining that for, according to Burke, 45 minutes. We don't know. We don't know what temperature Burke is actually burning at with relation to the measurement metric in the 803 patent. Kingsford didn't present any calculations, any tests, any literature. And the scientific evidence— I guess what's sticking in my mind is, I think your friend referred to a passage in your patent that says Burke has conventional briquettes, and then another passage that says conventional briquettes will sustainably burn at 1,000 degrees Fahrenheit. Right, and so if you take a look at the temperature data displayed in the 803 patent, what Burke describes can't be those conventional briquettes, or Burke doesn't meet the time limitation. It takes 25 minutes to get to 1,000 degrees Fahrenheit. And in that case, we don't know whether Gruese would have improved Burke to the point where Burke gets to 1,000 degrees Fahrenheit within 15 minutes. That's the issue. What Burke purports to describe and what's described in the 803 patent have very different burning profiles, and in that respect, we don't know Burke would have performed even as well as the conventional 803 briquettes in the 803 patent. Okay, thank you, Mr. Weinerschnank. I'll call the council on cases submitted.